Kenneth B. Black (Utah State Bar No. 5588)
ken.black@stoel.com
Lauren A. Shurman (Utah State Bar No. 11243)
lauren.shurman@stoel.com
STOEL RIVES LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

Mark S. Mester (*pro hac vice*)
mark.mester@lw.com
Kathleen P. Lally (*pro hac vice*)
kathleen.lally@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700

Attorneys for Defendant John C. Heath,
Attorney at Law, d/b/a Lexington Law Firm

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| **EDWARD LESLIE, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOHN C. HEATH ATTORNEY AT LAW, PROFESSIONAL LIMITED LIABILITY COMPANY d/b/a LEXINGTON LAW,**<br><br>**Defendant.** | **Case No. 2:15-cv-00833-PMW**<br><br>**MOTION TO COMPEL ARBITRATION AND MEMORANDUM IN SUPPORT**<br><br>**Magistrate Judge Paul M. Warner** |

**TABLE OF CONTENTS**

**Page**


I. RELIEF SOUGHT ....1

II. INTRODUCTION ....1

III. RELEVANT FACTUAL BACKGROUND ....2

A. Plaintiff Requests That Lexington Contact Him Regarding A Free Credit Repair Consultation And, In Doing So, Agrees To Lexington's Terms Of Use ....2

B. The Terms Of Use To Which Plaintiff Agreed Contains An Arbitration Provision ....4

C. Despite The Agreement To Arbitrate, Plaintiff Files A Class Complaint In Federal Court ....6

IV. ARGUMENT ....6

A. Plaintiff And Lexington Entered Into A Valid Arbitration Agreement ....8

B. This Dispute Plainly Falls Within The Scope Of The Arbitration Agreement And Any Disputes Regarding The Scope Of Arbitration Are Delegated To The Arbitrator ....10

V. CONCLUSION ....13

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

AT&T v. Concepcion,
563 U.S. 333 (2011) ... 7

Central Florida Invs., Inc. v. Parkwest Assocs.,
2002 UT 3 (Utah 2002) ... 10

Cox v. Ocean View Hotel,
533 F.3d 1114, 1119 (9th Cir. 2008) ... 8

Day v. Microsoft,
2014 WL 243159 (W.D. Wash. 2014) ... 9

Getzelman v. Trustwave Holdings,
2014 WL 3809736 (D. Colo. 2014) ... 12

Hancock v. AT&T,
701 F.3d 1248 (10th Cir. 2012) ... 4, 9, 10

Imperial Sav. Ass'n v. Lewis,
730 F. Supp. 1068 (D. Utah 1990) ... 7

In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 27 F.C.C.R. 1830 (F.C.C. Feb. 15, 2012) ... 4

Island Peak Ranch v. FIIK Inv.,
2008 WL 2673925 (D. Utah 2008) ... 8

Lamkin v. Morinda Properties,
2012 WL 2913257 (D. Utah 2012) ... 8

Local 5-857 Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Conoco Inc., 320 F.3d 1123 (10th Cir. 2003) ... 8

Mariposa v. United Shipping Solutions,
295 P.3d 1173 (Utah App. Ct. 2013) ... 10

Mitsubishi v. Soler Chrysler-Plymouth,
473 U.S. 614 (1985) ... 8

Morales v. Cont'l Fin.,
2009 WL 2579093 (D. Utah 2009) ... 8

Oracle v. Myriad,
724 F.3d 1069 (9th Cir. 2013) .......... 12

Pro Tech Indus. v. URS,
377 F.3d 868 (8th Cir. 2004) .......... 8

Rent-A-Center v. Jackson,
561 U.S. 63 (2010) .......... 12

Sanchez v. Nitro-Lift,
762 F.3d 1139 (10th Cir. 2014) .......... 8, 10, 11

Sherman v. AT&T,
2012 WL 1021823 (N.D. Ill. 2012) .......... 9

Steigerwalt v. Terminix,
246 F. Appx. 798 (3d Cir. 2007) .......... 11

Stolt-Nielsen v. AnimalFeeds Int'l Corp.,
559 U.S. 662 (2010) .......... 5

Swift v. Zynga,
805 F. Supp. 2d 904 (N.D. Cal. 2011) .......... 9

THI of N.M. v. Patton,
741 F.3d 1162 (10th Cir. 2014) .......... 7

Vernon v. Qwest,
925 F. Supp. 2d 1185 (D. Colo. 2013) .......... 10

Walker v. BuildDirect.com,
733 F.3d 1001 (10th Cir. 2013) .......... 7

Zurich v. Watts,
466 F.3d 577 (7th Cir. 2006) .......... 8

**STATUTES**

9 U.S.C. § 2 .......... 7

9 U.S.C. § 3 .......... 8

Telephone Consumer Protection Act,
47 U.S.C. § 227 .......... 4

## I. RELIEF SOUGHT

Defendant John C. Heath, Attorney at Law, PLLC, d/b/a/ Lexington Law Firm ("Lexington") respectfully moves to compel arbitration and dismiss or stay the Complaint filed by Plaintiff Edward Leslie ("Plaintiff"). As discussed more fully herein, Plaintiff expressly requested services from Lexington, and in so doing, he agreed to be bound by the terms of certain agreements, one of which, namely the Terms of Use, includes an arbitration clause that plainly requires Plaintiff to arbitrate "any claim" between Lexington and him.

## II. INTRODUCTION

In requesting a free credit repair consultation from Lexington, Plaintiff expressly consented to being bound by the terms of certain agreements. One of those agreements -- the Terms of Use -- contains an arbitration clause requiring Plaintiff to arbitrate "any claim" between Lexington and him, including claims alleging violations of state or federal statutory law. This agreement also requires arbitration of any disputes regarding the scope of the arbitration provision itself.

As has been repeatedly recognized, federal and state law both strongly favor arbitration in cases such as this, where the Plaintiff has entered into a valid and enforceable agreement to arbitrate and the claims contained in the Complaint clearly fall within the scope of that agreement. In accordance with that strong policy favoring arbitration and in conformance with the arbitration provision to which Plaintiff agreed, Lexington respectfully requests that the Court compel arbitration of Plaintiff's claims and dismiss or stay this action.

## III. RELEVANT FACTUAL BACKGROUND

The factual background relevant to this motion is set forth below. See disc. infra at 2-6.[1]

### A. Plaintiff Requests That Lexington Contact Him Regarding A Free Credit Repair Consultation And, In Doing So, Agrees To Lexington's Terms Of Use

On or about August 11, 2015, Plaintiff visited the website http://rentownhomelistings.com/. See Declaration of John C. Heath ("Heath Decl."), Ex. A, at ¶ 4; http://rentownhomelistings.com/, Ex. B. Plaintiff voluntarily provided his name, email address and phone number on http://rentownhomelistings.com/ and clicked on the link to "View Listings." See Heath Decl., Ex. A, at ¶ 5; http://rentownhomelistings.com/, Ex. B, at 12. Immediately below the "View Listings" link that Plaintiff clicked, the website informed Plaintiff that by clicking the "View Listings," he was consenting to being contacted by a representative from certain "marketing partners," and the website further provided a link to a list of those partners:

> I hereby consent to have a representative from the Marketing Partners to contact me regarding credit repair opportunities & other, on my landline or wireless number regardless if I am on the company, national or state DNC registry. I understand these contacts may be generated via pre-recorded message, automated dialer, email and SMS text. Registration is not a requirement for access. View general listings.

http://rentownhomelistings.com/, Ex. B, at 12.

One of the "marketing partners" identified on http://rentownhomelistings.com/ is Lexington, which performs consumer advocacy services to correct errors listed on consumers' credit reports. See Heath Decl., Ex. A, at ¶¶ 3, 7; http://rentownhomelistings.com/, Ex. B, at 12. After Plaintiff clicked on the link to "View Listings," he was directed to a page asking if he would like a credit repair specialist from Lexington to contact him to assist in repairing his

[1] Unless stated otherwise, all emphasis is supplied and all internal citations and quotations are omitted from any quoted material herein.

credit. See Heath Decl., Ex. A, at ¶ 8; Credit Repair Contact Request Page, Ex. C. Plaintiff, in turn, voluntarily clicked "Yes," thereby seeking a free consultation from Lexington. See Heath Decl., Ex. A, at ¶8. Plaintiff was in no way required to seek a free credit repair consultation from Lexington in order to otherwise view listings on http://rentownhomelistings.com/. See id. at ¶ 9; http://rentownhomelistings.com/, Ex. B. Indeed, had Plaintiff clicked the link for "No" after being asked if he would like a credit repair specialist from Lexington to contact him, he would have simply continued on http://rentownhomelistings.com/ and would not have been contacted by Lexington. See Heath Decl., Ex. A, at ¶ 9.[2]

Plaintiff, however, voluntarily sought a free consultation from Lexington, and in doing so, he expressly acknowledged that he agreed by electronic signature to be contacted by Lexington and to the Privacy Policy and Terms of Use:

> By clicking 'Yes' I agree by electronic signature to: (1) be contacted by Lexington Law Firm about credit repair or credit repair marketing by a live agent, artificial or prerecorded voice, and SMS text at my residential or cellular number (312) 555-0000, dialed manually or by autodialer, and by email (consent to be contacted is not a condition to purchase services); and (2) the Privacy Policy and Terms of Use.

Credit Repair Contact Request Page, Ex. C; see also Heath Decl., Ex. A, at ¶ 11.[3] The clause advising Plaintiff that he was agreeing to the Terms of Use appeared directly below the link

---

[2] In fact, Plaintiff had the ability to view listings on http://rentownhomelistings.com/ without consenting to being contacted by any "marketing partners" by clicking on the link to "View general listings." See http://rentownhomelistings.com/, Ex. B, at 12. Had Plaintiff done so, he would not have been directed to the page regarding credit repair services. See id.

[3] As noted above, by clicking "Yes" to receive a free credit repair consultation, Plaintiff also consented to receive both phone calls and SMS texts from Lexington (see Credit Repair Contact Request Page, Ex. C), a fact that seriously calls into question his claim that Lexington somehow violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), separate and apart from the fact that his claim is otherwise subject to arbitration. See, e.g., In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 27 F.C.C.R.

Plaintiff clicked, was in the same font color and size as the majority of the page and included an underlined hyperlink to each of the referenced documents, including the Terms of Use. See Credit Repair Contact Request Page, Ex. C. In no event, however, would Plaintiff or any member of his proposed class have been contacted by Lexington without first affirmatively seeking free credit repair consultation from Lexington and fully agreeing to the Privacy Policy and Terms of Use. See Heath Decl., Ex. A, at ¶ 12.[4]

### B. The Terms Of Use To Which Plaintiff Agreed Contains An Arbitration Provision

The Terms of Use to which Plaintiff agreed governs all aspects of Plaintiff's use of Lexington's services, including requests to be contacted by Lexington regarding credit repair services, participation in Lexington's "Text Message Program" and any engagement of Lexington's legal services. See Terms of Use, Ex. D, at 18. Moreover, the Terms of Use contain an arbitration agreement, which specifies that it is governed by the Federal Arbitration Act ("FAA") and otherwise states as follows:

> BY USING LEXINGTON'S WEBSITE, ENGAGING LEXINGTON'S LEGAL SERVICES, REQUESTING THAT LEXINGTON CONTACT YOU ABOUT ITS CREDIT REPAIR SERVICES, AND/OR PARTICIPATING IN LEXINGTON'S TEXT MESSAGE PROGRAM, **YOU AGREE TO ARBITRATE ALL CLAIMS BETWEEN YOU AND LEXINGTON ON AN INDIVIDUAL BASIS ONLY AND NOT AS A PART OF ANY CLASS. A 'CLAIM' IS ANY CASE, CONTROVERSY, DISPUTE, TORT, DISAGREEMENT, LAWSUIT, LEGAL ACTION, OR CLAIM NOW OR**

(…continued)
1830, 1843-44 (F.C.C. Feb. 15, 2012) (discussing prior express consent as a complete defense to TCPA claims).

[4] As discussed in more detail below, courts routinely hold that agreements (including arbitration agreements) that a customer agrees to by affirmatively clicking on a dialogue box are valid and enforceable. See, e.g., Hancock v. AT&T, 701 F.3d 1248, 1255-58 (10th Cir. 2012); disc. infra at 9-10.

> **HEREAFTER PENDING BETWEEN YOU AND LEXINGTON, INCLUDING BUT NOT LIMITED TO ANY ALLEGED STATE OF FEDERAL STATUTORY VIOLATION, OR ANY DISPUTE OVER THE INTERPRETATION OF THE WEBSITE TERMS OR THE ARBITRABILITY OF ANY CLAIM PURSUANT TO THE WEBSITE TERMS. THIS AGREEMENT TO ARBITRATE GOVERNS ALL PAST, CURRENT AND PROSPECTIVE INTERACTIONS WITH LEXINGTON. YOU AGREE THAT YOU ARE WAIVING ALL RIGHTS TO: (A) A TRIAL BY JURY; (B) PARTICIPATE IN A CLASS ACTION LAW SUIT OR CLASS ACTION ARBITRATION; AND (C) BRING AN ACTION AGAINST LEXINGTON IN A COURT OF LAW. YOU MAY INDIVIDUALLY ARBITRATE ANY CLAIM AGAINST LEXINGTON IN ANY JURISDICTION IN THE UNITED STATES. LEXINGTON WILL REIMBURSE YOU UP TO $300 OF YOUR ARBITRATION FILING FEE. THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION THEN IN FORCE SHALL GOVERN THE ARBITRATION** (provided, however, that the terms of the Website Terms shall control over any inconsistency between the Rules of the American Arbitration Association and the Website Terms). The arbitrator shall have authority to interpret the Website Terms, including but not limited to the authority to decide whether any claim is arbitrable under the Website Terms and to decide issues related to the scope of arbitration, the rules of arbitration, the arbitrator's jurisdiction, and the enforceability of the Website Terms. You agree that the Website Terms involves commerce under 9 U.S.C. §§ 1 et seq. and that this Arbitration Clause is governed by federal law, including the Federal Arbitration Act. The remainder of the Website Terms is governed by the laws of the state of Utah, as provided in Section 17 below.

Id. at 18-20 (emphasis in original).

As made clear by the foregoing, the arbitration agreement is detailed. See Terms of Use, Ex. D, at 18-20. Not only does it broadly require Plaintiff to arbitrate "all claims between [Plaintiff] and Lexington," but it also clearly and unambiguously identifies that the arbitration will take place on an individual (rather than class) basis and that Plaintiff has waived all rights to file a claim in court, to have a trial by jury and to participate in a class action. See id. at 19; see also Stolt-Nielsen v. AnimalFeeds Int'l Corp., 559 U.S. 662, 684-87 (2010) (class arbitration is not permitted in the absence of an express agreement to arbitrate class claims). It further specifies the governing arbitration rules, Plaintiff's financial obligations and that any disputes

regarding arbitrability and the scope of arbitration are expressly delegated to the arbitrator. See Terms of Use, Ex. D, at 19.

### C. Despite The Agreement To Arbitrate, Plaintiff Files A Class Complaint In Federal Court

On or about November 24, 2015, Plaintiff filed his Complaint in this Court, alleging that between August 11, 2015 and September 9, 2015, Lexington called Plaintiff on his cellular telephone allegedly using an automatic telephone dialing system without his prior consent and purportedly in violation of the TCPA. See Compl. (Dkt. #2) at ¶¶ 11-19, 32-37. Based on these allegations and completely without regard to the arbitration agreement or class waiver, Plaintiff seeks certification of a class of "[a]ll individuals in the United States whose wireless telephone number [Lexington], or someone on [Lexington's] behalf, called using an automatic telephone dialing system or an artificial or prerecorded voice without prior express written consent of the called party." Id. at ¶ 24.

Lexington was served with Plaintiff's Complaint on or about December 16, 2015. See Return of Service (Dkt. #8). Shortly thereafter, Lexington retained counsel, who immediately began investigating the facts of this case and determined that the matter was governed by the arbitration agreement. See disc. supra at 2-6.[5]

## IV. ARGUMENT

There is a strong policy under both federal and Utah law in favor of arbitration. See, e.g., THI of N.M. v. Patton, 741 F.3d 1162, 1165 (10th Cir. 2014) ("[T]he Supreme Court [has] expressed in the strongest terms the commitment to arbitration established by the FAA[.]");

[5] Counsel for Lexington discussed the arbitration agreement with counsel for Plaintiffs prior to filing this motion, and the parties agreed that it would be most efficient to have Lexington file their motion to compel arbitration in order to allow counsel for Plaintiffs to evaluate the issue.

Imperial Sav. Ass'n v. Lewis, 730 F. Supp. 1068, 1071 (D. Utah 1990).[6] The strong federal policy in favor of arbitration is manifested in the FAA, which provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; see also THI, 741 F.3d at 1165. Indeed, the FAA was enacted by Congress to reverse perceived judicial hostility toward arbitration agreements. See Concepcion, 563 U.S. at 342 ("[T]he judicial hostility towards arbitration that prompted the FAA had manifested itself in 'a great variety' of 'devices and formulas' declaring arbitration against public policy."); THI, 741 F.3d at 1165.

Accordingly, a party seeking to compel arbitration simply needs to demonstrate the existence of an agreement to arbitrate and that the agreement to arbitrate encompasses the dispute at issue. See, e.g., 9 U.S.C. § 3; Cox v. Ocean View Hotel, 533 F.3d 1114, 1119 (9th Cir. 2008); Zurich v. Watts, 466 F.3d 577, 580 (7th Cir. 2006); Pro Tech Indus. v. URS, 377 F.3d 868, 871 (8th Cir. 2004); see also Lamkin v. Morinda Properties, 2012 WL 2913257, at *9

---

[6] Questions regarding the validity and enforceability of an arbitration agreement are generally governed by state law. See, e.g., Walker v. BuildDirect.com, 733 F.3d 1001, 1004 (10th Cir. 2013) ("Generally, courts should apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute."). As noted above, the Terms of Use contain a choice of law clause stating that it is governed by federal law, the FAA and the laws of the State of Utah. See Terms of Use, Ex. D, at 19-20. As such, Lexington cites herein federal law with respect to the arbitration clause as well as Utah law to the extent appropriate and available. See disc. infra at 6-13. Importantly, however, the ability of state law to invalidate an arbitration agreement is otherwise limited by the FAA and federal law:

> Although [the FAA] provides that a written arbitration agreement 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract' . . . it preempts state-law rules that 'stand as an obstacle to the accomplishment of the FAA's objectives,' as by 'interfer[ing] with fundamental attributes of arbitration[.]'

Walker, 733 F.3d at 1004-05; see also, e.g., AT&T v. Concepcion, 563 U.S. 333, 346-52 (2011) (holding that California's "Discover Bank Rule," which allowed consumers to demand class arbitration even if not permitted by contract, was inconsistent with and preempted by the FAA).

(D. Utah 2012) (unpublished) (acknowledging this standard). In addressing a motion to compel arbitration, however, there is a presumption of arbitrability:

> [T]here is a presumption in favor of arbitrability; that is, an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

Sanchez v. Nitro-Lift, 762 F.3d 1139, 1147-48 (10th Cir. 2014) (quoting Local 5-857 Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Conoco Inc., 320 F.3d 1123, 1126 (10th Cir. 2003)); see also Mitsubishi v. Soler Chrysler-Plymouth, 473 U.S. 614, 626 (1985).

**A. Plaintiff And Lexington Entered Into A Valid Arbitration Agreement**

As the party seeking to compel arbitration, Lexington "has the burden of demonstrating the existence of an enforceable agreement to arbitrate." Island Peak Ranch v. FIIK Inv., 2008 WL 2673925, at *9 (D. Utah 2008) (unpublished). Lexington, however, easily satisfies this requirement: the Terms of Use contain a clear and unambiguous agreement to arbitrate all claims between Plaintiff and Lexington. See Terms of Use, Ex. D, at 18-19; disc. infra at 10-12. This arbitration agreement is clearly marked in capitalized and bolded letters that begin on the first page of the Terms of Use. See Terms of Use, Ex. D, at 18-19; see also Morales v. Cont'l Fin., 2009 WL 2579093, at *2-3 (D. Utah 2009) (unpublished) (compelling arbitration and noting that the agreement in bold letters and conspicuously marked was validly formed). Plaintiff affirmatively agreed to the Terms of Use -- including the arbitration agreement -- when he voluntarily and affirmatively requested that Lexington contact him for a free credit repair consultation. See Heath Decl., Ex. A, at ¶¶ 8-12; Credit Repair Contact Request Page, Ex. C; disc. supra at 2-4.

Notably, courts repeatedly hold that similar "clickwrap" or "click-through" arbitration agreements are valid and have routinely compelled arbitration based upon those agreements.[7] See, e.g., Hancock, 701 F.3d at 1256-58 (affirming the district court's dismissal based upon an arbitration clause in a clickwrap agreement and noting that "[c]lickwrap agreements are increasingly common and 'have routinely been upheld'"); see also Day v. Microsoft, 2014 WL 243159, at *2-3 (W.D. Wash. 2014) (unpublished) (clickwrap agreement was enforceable when "Plaintiff had to accept the terms of the Windows 8 Pro agreement by checking an 'I accept the license terms' box and then by clicking on an 'Accept' button before accessing the product"); Sherman v. AT&T, 2012 WL 1021823, at *3 (N.D. Ill. 2012) (unpublished) (compelling arbitration of a clickwrap agreement, noting that the plaintiff had reasonable notice of the terms when he had to click that he agreed to them prior to the transaction); Swift v. Zynga, 805 F. Supp. 2d 904, at 910-12 (N.D. Cal. 2011) (enforcing an arbitration agreement contained in a clickwrap agreement when the plaintiff "was provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button" that plaintiff clicked).

As Judge Jackson of the District of Colorado aptly observed, arbitration agreements that are entered into electronically have become the norm and are fully enforceable:

> We live in an electronic age. It is commonplace these days to enter into agreements electronically . . . plaintiffs had a reasonable opportunity to access the Subscriber Agreement had they wished to do so. They received repeated instructions to do so as well as warnings that by enrolling in the Program they were agreeing to be bound by the terms and conditions of the program. They accepted the benefits of the Price for Life Program, and I conclude that they are bound by the arbitration and class action waiver terms.

---

[7] "Clickwrap is a commonly used term for agreements requiring a computer user to consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with [a] . . . transaction." Hancock, 701 F.3d at 1255.

Vernon v. Qwest, 925 F. Supp. 2d 1185, 1191 (D. Colo. 2013). This logic applies with equal force in this case: Plaintiff was made aware that his request for services from Lexington was governed by the Terms of Use. See Credit Repair Contact Request Page, Ex. C. Plaintiff affirmatively accepted those Terms of Use, and therefore, Plaintiff is bound by it. See, e.g., Hancock, 701 F.3d at 1256-58.

**B. This Dispute Plainly Falls Within The Scope Of The Arbitration Agreement And Any Disputes Regarding The Scope Of Arbitration Are Delegated To The Arbitrator**

Both federal law and Utah law strongly favor arbitration and manifest these policies by resolving all disputes regarding the scope of an arbitration agreement in favor of arbitration. See, e.g., Sanchez, 762 F.3d at 1147-48; Mariposa v. United Shipping Solutions, 295 P.3d 1173, 1177 (Utah App. Ct. 2013) ("[I]f there is any question as to whether the parties agreed to resolve their disputes through arbitration or litigation . . . we interpret the agreement keeping in mind our policy of encouraging arbitration. It is the policy of the law in Utah to interpret contracts in favor of arbitration[.]") (quoting Central Florida Invs., Inc. v. Parkwest Assocs., 2002 UT 3, ¶ 16 (Utah 2002)); disc. supra at 5-6. Moreover, the arbitration agreement in this case is broad and encompasses "all claims between [Plaintiff] and Lexington," including any claims that "allege[] state or federal statutory violation." See Terms of Use, Ex. D; see also, e.g., Steigerwalt v. Terminix, 246 F. Appx. 798, 801 (3d Cir. 2007) (holding that an arbitration agreement requiring arbitration of "all claims" was broad).

The claims made by Plaintiff in the Complaint undoubtedly fall within the scope of this agreement. See Compl. (Dkt. #2) at ¶¶ 11-19, 32-37. Plaintiff alleges that he and members of a proposed class received unsolicited calls and/or text messages to their cellular telephones from

Lexington and that these messages supposedly violated the TCPA, notwithstanding the fact that Plaintiff had consented to receiving calls and text messages from Lexington. See id. at ¶¶ 11-22, 24, 32-37. These allegations are plainly a "claim" alleging a violation of federal law -- namely, the TCPA -- between Plaintiff and Lexington. See id.; Terms of Use, Ex. D, at 18-19. Moreover, the alleged calls and texts were also plainly related to Plaintiff having voluntarily sought a free credit repair consultation with Lexington, as the calls make clear that Lexington was specifically calling with respect to Plaintiff's voluntary request for credit repair services. See Compl. (Dkt. #2) at ¶¶ 14-15.

Accordingly, Plaintiff's allegation that he received "unsolicited" calls to which he did not consent is inextricably linked to his request for a free credit repair consultation with Lexington. Compare Compl. (Dkt. #2) at ¶¶ 11-23 (alleging that Plaintiff received unsolicited calls for which he did not provide consent), with Terms of Use, Ex. D, at 18-19 (agreeing to arbitrate "all claims" between Plaintiff and Lexington), and Credit Repair Contact Request Page, Ex. C (providing Plaintiff's consent to receive phone calls and text messages). Given the breadth of the arbitration agreement, however, it certainly cannot be said with "positive assurance" that there is no interpretation of the agreement that would encompass this dispute. See Sanchez, 762 F.3d at 1147-48. Quite to the contrary, Plaintiff quite clearly agreed to arbitrate disputes such as this. See Terms of Use, Ex. D, at 18-20; disc. supra at 4-6.

In any event, any disputes regarding the scope of the arbitration agreement would themselves be subject to arbitration, per the Terms of Use to which Plaintiff agreed:

> The arbitrator shall have the authority to interpret the [Terms of Use], including but not limited to the authority to decide whether any claim is arbitrable under the [Terms of Use] and to decide issues related to the scope of arbitration, the rules of

> arbitration, the arbitrator's jurisdiction, and the enforceability of the [Terms of Use].

Terms of Use, Ex. D, at 19. Thus, even if there were some question regarding whether this dispute falls within the scope of the arbitration agreement (and Lexington respectfully submits that there is not), that question should be resolved by the arbitrator. See, e.g., Rent-A-Center v. Jackson, 561 U.S. 63, 68-69 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); see also Getzelman v. Trustwave Holdings, 2014 WL 3809736, at *2-3 (D. Colo. 2014) (unpublished) (holding that the parties clearly and unmistakably agreed to allow the arbitrator to decide arbitrability); Oracle v. Myriad, 724 F.3d 1069, 1072 (9th Cir. 2013) (arbitrability may be decided by the arbitrator if there is clear evidence of the parties' agreement to allow him or her to do so).

Because Lexington has shown the existence of a valid arbitration agreement and that this matter falls within the scope of that agreement, its motion to compel arbitration should be granted, and this matter should be dismissed or stayed. See disc. supra at 2-12.

## V. CONCLUSION

For the reasons set forth above, Lexington respectfully requests that this Court enforce the arbitration agreement in its agreement with Plaintiff and grant its motion to compel arbitration. Lexington further requests that the Court dismiss or stay these proceedings and grant any other relief the Court deems appropriate.

Dated: February 5, 2016

Respectfully submitted,

/s/ Kathleen P. Lally
One of the Attorneys for Defendant
John C. Heath, Attorney at Law,
d/b/a Lexington Law Firm

Kenneth B. Black (Utah State Bar No. 5588)
ken.black@stoel.com
Lauren A. Shurman (Utah State Bar No. 11243)
lauren.shurman@stoel.com
STOEL RIVES LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

Mark S. Mester (*pro hac vice*)
mark.mester@lw.com
Kathleen P. Lally (*pro hac vice*)
kathleen.lally@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700

**CERTIFICATE SERVICE**

I hereby certify that on the 5th day of February, 2016, I caused a true and correct copy of the foregoing MOTION TO COMPEL ARBITRATION AND MEMORANDUM IN SUPPORT as well as the APPENDIX OF EXHIBITS IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND MEMORANDUM IN SUPPORT to be served via ECF notification on the following:

| | |
|---|---|
| Karolina Kulesza<br>DRIGGS, BILLS & DAY, PC<br>331 South 600 East<br>Salt Lake City, UT 84102<br>kkulesza@lawbdb.com | Tina Wolfson<br>AHDOOT & WOLFSON PC<br>1016 Palm Avenue<br>West Hollywood, CA 90069-4059<br>twolfson@ahdootwolfson.com |
| Ismael T. Salam<br>Joseph J. Siprut<br>SIPRUT PC<br>17 N State Street, Suite 1600<br>Chicago, IL 60602<br>isalam@siprut.com<br>jsiprut@siprut.com | |

/s/ Kathleen P. Lally